1997-NMSC-057

947 P.2d 495

**In the Matter of Alfonso BARRERA, Jr., an Attorney Admitted to Practice before the Courts of the State of New Mexico.**

No. 24498.

Supreme Court of New Mexico.

Oct. 28, 1997.

Virginia L. Ferrara, Chief Disciplinary Counsel, Albuquerque, for Disciplinary Board.

Manuel I. Arrieta, Las Cruces, for Respondent.

OPINION

PER CURIAM.

(1) This matter came before the Court following disciplinary proceedings conducted pursuant to the Rules Governing Discipline, 17–101 to –316 NMRA 1997. Pursuant to Rule 17–211(A)(2), Alfonso Barrera, Jr. has conditionally agreed not to contest allegations that he committed numerous violations of the Code of Professional Conduct, specifically Rules 16–101, 16–102(A), 16–103, 16–104(A), 16–105(A), 16–116(D), 16–801(A), 16–801(B), 16–804(D), and 16–804(H). In exchange for this agreement, respondent and disciplinary counsel agreed that he would receive as discipline a period of suspension, which would be deferred on certain conditions. While we are concerned with the leniency of the sanction in light of respondent's multiple violations of the Rules of Professional Conduct, we hereby adopt the recommendation of the disciplinary board that the conditional agreement not to contest and consent to discipline be accepted.

(2) In May 1995, Juan Carlos Bargeles paid respondent $1500 to represent him in an immigration matter and to cover any necessary filing fees. Bargeles and his family were facing deportation to Guatemala and wanted to apply for political asylum. Respondent agreed to file a political asylum application with the Immigration and Naturalization Services ("INS") on behalf of Bargeles and his family and did so.

(3) In July 1995, however, the INS application was returned to respondent because of deficiencies in the document and because the required fee had not been included with the application. Respondent failed to advise Bargeles of either development but simply turned the Bargeles file over to another attorney, who, on August 31, 1995, returned the file to Bargeles with a note referring him to yet another attorney.

(4) Although respondent insisted that the $1500 was intended only as a payment toward his quoted fee of $3000, that no portion was to be applied toward the fees to be paid to INS, and that he had earned the entire amount, he failed to provide disciplinary counsel with either a copy of his fee agreement or an accounting of time spent on the Bargeles case.

(5) In 1993, respondent was appointed to represent Dewitt Powells in a criminal matter. On November 23, 1993, Powells was convicted by way of jury verdict, and, on December 1, 1993, sentenced to twelve (12) years of incarceration. On January 12, 1994, an amended judgment and sentence was entered finding Powells to be an habitual offender and sentencing him to an additional period of incarceration.

(6) Powells requested respondent to appeal these convictions. Pursuant to Rule 12–201(A) NMRA 1997, a notice of appeal should have been filed by respondent, as trial counsel, within thirty (30) days of the entry of the judgment and, pursuant to 12–208(B) NMRA 1997, a docketing statement should have been filed thirty (30) days thereafter. Court records indicated that no notice of appeal nor any other document relating to an appeal was ever filed by respondent.

(7) In August 1995, Powells inquired in writing about the status of his appeal, but respondent never replied to the letter. Powells' subsequent telephone calls to respondent's office were either not accepted or never returned.

(8) In his response to disciplinary counsel's inquiry, respondent claimed that Powells was so satisfied with his representation that he sent respondent a thank-you note, that he was happy with his sentence and never requested an appeal, and, furthermore, that since this was an appointed case, the public defender would have had to have approved funds for an appeal. Despite a request from disciplinary counsel, respondent failed to produce a copy of the alleged "thank-you" note or address the question of whether and/or how he responded to Powells' letter.

(9) On October 6, 1994, Kowynn Elkins was arraigned in magistrate court and released on $1000 bond pending trial. On February 17, 1995, the magistrate judge set trial for March 7, 1995, and sent notice to Elkins. Shortly thereafter, Elkins paid respondent $500 to represent him.

(10) On March 3, 1995, respondent entered his appearance and requested a continuance of the March trial setting. The motion was granted, and, on March 17, 1995, a notice of trial to be held on April 4, 1995, was sent to respondent. Respondent filed a second motion for continuance alleging he had a conflict with the April 4 trial setting, and an order granting the motion was entered the same date. On June 19, 1995, a notice of trial for June 27, 1995, was sent to respondent. Respondent requested a third continuance until late August for the reason that he had undergone open heart surgery. The court again issued an order granting the motion.

(11) On August 11, 1995, a notice of trial for August 24, 1995, was sent to respondent. Respondent failed to advise Elkins of this setting and made no request for continuance. Neither respondent nor Elkins appeared for the trial. The magistrate judge attempted to call respondent but was advised that his office phone had been disconnected. Respondent was held in contempt of court, and the matter was rescheduled for September 8, 1995. Notice of trial was personally served on respondent and on Elkins.

(12) On August 29, 1995, an employee of respondent wrote to the magistrate court advising that respondent had moved to Nevada. Elkins was never advised by respondent that he was moving out of state, and he learned of this only from the magistrate judge when he appeared on September 8 for his trial. None of the $500 fee paid by Elkins was refunded to him by respondent.

(13) An assistant district attorney representing the State of New Mexico in the magistrate court case reported respondent's conduct and his sudden move to Nevada to the State Bar of New Mexico, who, in turn, forwarded the complaint to the office of disciplinary counsel. When contacted for an explanation, respondent stated that had the assistant district attorney, his client, and the

judge checked the court file they would have discovered that he had never entered an appearance for Elkins, as he was having surgery at the time of the alleged offense.

(14) Disciplinary counsel provided respondent with copies of his entry of appearance and numerous motions for continuance and suggested that, in light of this evidence, he might want to amend his previous response. She also requested that respondent provide a copy of any accounting of funds provided to Elkins at the time of his apparent withdrawal from the case as well as a copy of any notice sent to Elkins that he would no longer be representing him.

(15) Respondent answered the inquiries with a belligerent letter advising disciplinary counsel to read his responses more carefully. Respondent failed to respond to a third request to address the allegations made by the assistant district attorney.

(16) Between November 1993 and January 1994, Scoti A. Bartlett paid Respondent $1800 to seek an upgrade of his military discharge from "General" to "Honorable." On June 28, 1995, Paula Barrera, respondent's wife and legal assistant, wrote to advise Bartlett that respondent had undergone open heart surgery and would be unable to return to work until August 1995. She gave Bartlett the option of seeking new counsel or waiting until her husband could resume work on the case in late August and offered to assist him in proceeding in either fashion.

(17) Bartlett attempted for two months to reach respondent's office about his case but was unsuccessful. In August, he was advised that respondent's office telephone had been disconnected. He went to the office hoping to get his file but was advised by an employee that all files were in storage.

(18) Bartlett had no idea what, if anything, respondent did on his behalf. Subsequently, he discovered that nothing was filed with the Army and learned that the statute of limitations to request action would expire in October 1995; however, Bartlett was unable to contact another attorney to assist him because respondent had possession of all documents necessary to proceed.

(19) On October 6, 1995, and again on November 13, 1995, disciplinary counsel sent copies of Bartlett's complaint to respondent and requested him to address the allegations. Respondent failed to reply to these requests.

(20) In November 1993, Charles E. Mullin, III, retained respondent to obtain reimbursement for furniture and other belongings that were lost while working in the Philippines on an Air Force base under a contract between New Mexico State University and the United States Air Force. Mullin's belongings were lost as the result of his forced evacuation from his apartment due to a volcanic eruption and the failure of Air Force personnel to provide security from looters in his absence. Mullin paid respondent an initial retainer of $1500 and was subsequently billed for and paid respondent several thousand dollars more.

(21) On November 22, 1993, respondent filed a lawsuit in the United States District Court for New Mexico alleging breach of contract and negligence and seeking damages for Mullin. On May 16, 1994, attorneys for the Air Force and other defendants moved to dismiss their clients from the case on the basis of lack of jurisdiction. Respondent failed to respond to this motion, and on April 5, 1995, these defendants were dismissed from the lawsuit.

(22) On January 11, 1994, Defendant James Halligan, President of New Mexico State University, moved to dismiss the case as to him for lack of subject matter jurisdiction, which motion was granted on May 23, 1995. At this time, respondent advised Mullin that the case against Halligan could be refiled in state district court, and it was agreed that respondent would proceed to do this. Mullin was also advised that he could proceed against the federal defendants in the United States Court of Claims, but he elected not to do so.

(23) No case was ever filed in state court against Halligan. On June 17, 1995, the attorney for Halligan moved in the federal case to have his client's attorney fees in the amount of $8584 assessed against Mullin. On June 28, 1995, respondent requested and, on June 30, 1995, was granted an extension of time until late August 1995 within which to

respond to the motion. Respondent failed to advise Mullin of the motion for attorney fees and neither filed a response to the motion nor sought a further extension of time to do so.

(24) In August 1995, respondent moved to Nevada and failed to advise Mullin of the move or return his file to him, although he provided disciplinary counsel with what purportedly was a copy of a form letter he had sent to Mullin, which Mullin claims to have not received. Mullin unsuccessfully attempted to reach respondent numerous times in August. Through the assistance of one of respondent's employees, Mullin received his file in September but could not discern the status of the case.

(25) In replying to Mullin's complaint, respondent advised disciplinary counsel only that he told Mullin the case needed to be filed in the U.S. Court of Claims and that Mullin decided not to go to the expense. No mention was made of the pleadings he filed in the U.S. District Court nor the subsequent dismissal of the case based in part because of his inaction.

(26) On October 10, 1995, the court granted Halligan's motion and assessed $8584 in attorney fees against Mullin. Mullin learned of this from opposing counsel rather than from respondent.

(27) On June 17, 1994, Barbara L. Vezzani hired respondent to assist her in a claim she believed that she had against a particular school district. She paid respondent an initial consultation fee of $53.18 plus $2000 toward a retainer. Within the next two weeks, she paid another $500 toward the retainer. The retainer agreement promised that she would receive periodic billing statements, although she never did, and she was largely unaware of what services were being performed on her behalf.

(28) Despite her mother's terminal illness during the summer of 1994, Vezzani spent a great deal of time assembling documents and other information that respondent advised were necessary for him to properly investigate and present her case. During the fall of 1994 and the spring of 1995, respondent assured the client that her case was progress-ing. The client had the clear impression that a suit had been filed on her behalf.

(29) On April 27, 1995, Vezzani drove to Las Cruces from Silver City to meet with respondent and called ahead to advise that she would be a little late. Upon her arrival, no one in respondent's office could tell Vezzani where respondent was. Vezzani wrote a note to respondent while still in his office expressing her displeasure with his failure to keep their appointment. In her letter, she referred several times to her "suit," requesting that it be brought to a close or settled as soon as possible, as she was in desperate need of funds. She also asked for copies of documents supplied by respondent to one of the opposing parties.

(30) On May 4, 1995, respondent replied by letter that his staff had been instructed to tell her that he would be unavailable and had called her repeatedly after her call but received no answer. He failed to apologize for having inconvenienced her and also stated that he was not providing her with copies of any letters or documents because it would be an "unnecessary expenditure." He promised to convey her desire to "settle this matter now" to the defendant(s) but failed to correct her obvious misimpression that a suit had been filed. He further noted that "only issues of dire necessity should be considered adequate reason for you and I to speak personally" but promised to keep her advised of further developments.

(31) In May, the client attempted to communicate with respondent through several letters and, in one letter, advised him of a temporary change in her address. She reminded him that she also needed for him to be working on the renewal of her teaching certification and inquired generally as to the status of her lawsuit. Respondent failed to reply to these letters.

(32) In July, the client wrote to advise that she had moved back to Silver City and asked whether there was any prospect of settlement. On July 19, 1995, she received a letter from respondent expressing surprise that she was apparently unaware of his June surgery, as his staff had been instructed to advise her of his ill health. He told her that "the correspondence which was sent to you an-

nouncing my surgery", which was never received by client, suggested to her that she might want to change attorneys and urged her to do so.

(33) The client immediately responded and expressed her sympathy regarding his illness and also advised him that she had not been previously notified of his condition. She told him that she had no money to pay retainer fees to another attorney but would try to do so if he did not think he would be able "to settle my lawsuit" when he returned to work in August. She asked that he refer her to another attorney, if this would not be possible.

(34) The only response Vezzani received was a notice that respondent was closing his practice. She retrieved her file but found no copies of any pleadings filed on her behalf and confirmed this fact with the district court.

(35) On September 15, 1995, Vezzani wrote to respondent in Nevada requesting a refund of her retainer but received no response from him. In response to the complaint Vezzani filed with the office of disciplinary counsel, respondent said that Vezzani was aware at all times that no lawsuit had been filed and that he had been ill. He enclosed a copy of a bill purportedly sent to Vezzani in January 1995 showing a balance due of $41.61 and requested disciplinary counsel to attempt to collect it for him. When shown a copy of the purported January bill, Vezzani stated that she had never seen such a bill and that the file she received from respondent's office showed no copy of the bill.

■■■ (36) While we understand that respondent was experiencing serious health problems during 1995, this explains, but fails to excuse, only a portion of his neglect of his clients' cases and failure to communicate with them on a regular basis. When an attorney either accepts money from an individual or an appointment from a court to provide legal representation, the attorney in all instances is obligated to provide the necessary legal services in a timely and competent manner. An attorney must keep the client advised of all developments and follow the client's wishes regarding the goals of the representation.

■■ (37) Similarly, when an attorney is required by reason of ill-health or otherwise to withdraw from the representation of a client, an attorney must comply with court rules regardless of the reason for the withdrawal. *See* Rule 12–302 NMRA 1997 (appellate court rule regarding withdrawal or substitution of attorneys); Rules 1–089 and 5–107 NMRA 1997 (district court rules); Rules 3–108 and 7–107 NMRA 1997 (metropolitan court rules); Rules 2–108 and 6–107 NMRA 1997 (magistrate court rules); Rule 8–107 NMRA 1997 (municipal court rule). At a minimum, the attorney shall return the file to the client and refund the balance of any fee paid in advance but as yet unearned.

■■ (38) Ordinarily, the pattern of neglect and incompetence exhibited by respondent would result in a period of actual suspension in order to insure that the public is adequately protected followed by a reinstatement proceeding wherein the attorney would be required to demonstrate fitness to resume the practice of law. *See, e.g., In re Bloomfield,* 121 N.M. 605, 916 P.2d 224 (1996); *In re Romero,* 117 N.M. 577, 874 P.2d 785 (1994); *In re Roberts–Hohl,* 116 N.M. 700, 866 P.2d 1167 (1994); and *In re Shepard,* 115 N.M. 687, 858 P.2d 63 (1993). In that respondent has moved from the jurisdiction and has taken inactive status due to his continuing health problems, however, it does not appear that he is currently in a position to further endanger the public. Accordingly, we agree with the hearing committee and the disciplinary board that the more important consideration is to insure that he makes restitution to the persons injured by his misconduct.

(39) Respondent and disciplinary counsel were unable to agree upon the amount of restitution due to the clients who paid money and obtained little, if any service in return. Consequently, both parties submitted documentation to the hearing committee and agreed that the committee's determination of the amounts of restitution would be binding. The committee directed respondent to reimburse $1056 to Juan Carlos Bargeles, $500 to Larry Elkins for Kowynn Elkins, $1267 to Scoti A. Bartlett, $1905 to Charles E. Mullin, III, and $1750 to Barbara L. Vezzani.

(40) NOW, THEREFORE, IT IS OR-DERED that the conditional agreement not to contest and consent to discipline is approved and that respondent hereby is suspended from the practice of law pursuant to Rule 17–206(A)(2) NMRA 1997 for a minimum of three (3) years effective October 28, 1997.

(41) IT IS FURTHER ORDERED that the imposition of said period of suspension shall be deferred for a period of three (3) years pursuant to Rule 17–206(B)(1) NMRA 1997 and respondent shall be placed on probation on the following terms and conditions:

(1) Respondent shall reimburse Juan Carlos Bargeles, Larry Elkins, Scoti A. Bartlett, Barbara L. Vezzani, and Charles E. Mullin, III, in the amounts determined by the hearing committee to be owed to them on or before December 1, 1997, or, alternatively, make payment through the office of disciplinary counsel at the rate of $300 per month payable by the tenth day of each month with any unpaid balance bearing interest at the rate of fifteen per cent (15%) per annum;

(2) Should any of the above-named persons seek and receive compensation from the Client Protection Fund of the amount(s) ordered to be paid to them, then respondent shall reimburse the fund in lieu of payment to the client;

(3) Respondent shall make this restitution as a condition of his probation and for the protection of the public and that any wilful non-payment, such as discharging these obligations in any bankruptcy proceeding, shall give rise to proceedings wherein his probation could be revoked and further discipline imposed;

(4) Respondent shall commit no violations of the Rules of Professional Conduct during his probationary period;

(5) Respondent shall promptly and thoroughly respond to any inquiries from the office of disciplinary counsel regarding any allegations of misconduct filed against him; and

(6) Respondent shall reimburse the disciplinary board its costs in bringing this action in the amount of $459.25 on or before December 1, 1997, and any unpaid balance after that date shall bear interest of fifteen per cent (15%) per annum.

(42) IT IS FURTHER ORDERED that any failure to abide by any and all of the conditions of probation shall be brought to the attention of this Court by disciplinary counsel pursuant to Rule 17–206(G) NMRA 1997 and that if found to be in contempt of this Court, respondent may be fined, censured, suspended, or disbarred.

(43) IT IS FURTHER ORDERED that the disposition of this matter shall have the full force and effect of a judgment.

(44) IT IS SO ORDERED.

(45) /s/ Gene E. Franchini
Gene E. Franchini, Chief Justice

(46) /s/ Joseph F. Baca
Joseph F. Baca, Justice

(47) /s/ Pamela B. Minzner
Pamela B. Minzner, Justice

(48) /s/ Patricio M. Serna
Patricio M. Serna, Justice

(49) /s/ Daniel A. McKinnon, III
Daniel A. McKinnon, III, Justice